**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**BOAT YARD ACQUSITION**
**COMPANY, LLC,**

      **Plaintiff,**　　　　　　　　　　**Case No.**
　　　　　　　　　　　　　　　　　　**Hon.**

**v.**

**CHICAGO TITLE INSURANCE**
**COMPANY,**

      **Defendant.**

---

## COMPLAINT

**NOW COMES** Plaintiff, Boat Yard Acquisition Company, LLC ("BYAC")[1], by and through its undersigned counsel, and for its Complaint against Defendant, Chicago Title Insurance Company ("Chicago Title"), states as follows:

### NATURE OF THE ACTION

1.　　　This is an action for the purpose of determining an actual controversy between the parties, and construing rights and legal obligations arising from an ALTA Owner's Policy of Title Insurance issued by Chicago Title to BYAC, policy number 82108072NTS, with a policy date of September 20, 2020 ("the Policy"), issues arising from the Policy, Chicago Title's breach of the Policy, and the damages

---

[1] BYAC was formerly known as By Acquisition Company, LLC.

due to BYAC as a result of Chicago Title's breach.

## PARTIES

2.      Plaintiff, BYAC, at all relevant times was a Michigan limited liability company, with its principal address in Warren, Michigan.

3.      BYAC's direct or indirect members include QOF Holdings, LLC, a Michigan LLC; DIBC Holdings, LLC, a Michigan LLC; Redoubtable, LLC, an Indiana LLC; 2020 LSM Trust, a trust organized under Michigan law; and 2020 NMM Trust, a trust organized under Michigan law. Matthew T. Moroun, a Michigan resident, is the trustee of the 2020 LSM Trust and the 2020 NMM Trust.

4.      Defendant, Chicago Title, at all relevant times was a Florida domiciled insurance company, with its principal address in Jacksonville, Florida.

## JURISDICTION AND VENUE

5.      Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because BYAC is a resident of a different state than Chicago Title, and the value of the matter in controversy exceeds $75,000.00, exclusive of interest, fees, and costs.

6.      Venue in this District is proper pursuant to 28 U.S.C. § 1391 because: (1) Chicago Title does business within this District; (2) a substantial part of the events or omissions on which this matter is based occurred in this District; and/or (3) the Policy was issued to BYAC in this District.

**GENERAL ALLEGATIONS**

**Relevant Policy Language**

7.      As noted above, Chicago Title issued to BYAC the Policy, with a "Date of Policy" of September 20, 2020.

8.      The limit of liability for the Policy is $27 million.

9.      The Policy provides that it is "a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy."

10.      Under the Policy, Chicago Title insured "as of the Date of the Policy and, to the extent stated in Covered Risks 9 and 10, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of: 1. Title being vested other than as stated in Schedule A."

11.      In part, Schedule A contained a legal description of "Parcel 2" – done pursuant to a survey.

12.      Schedule A provided that the interest in Parcel 2 insured by the Policy was fee simple and title was vested in Pere Marquette Railway Company ("Pere Marquette") and BYAC.

13.      Prior to Chicago Title agreeing to insure BYAC's interest in Parcel 2, BYAC provided Chicago Title with numerous documents to inspect the title, including, but not limited to, the 1908 and 1927 Deeds with memos, parcel exhibits,

legal descriptions, a survey of Parcel 2 (which was ALTA certified), and a title commitment from Old Republic Title Insurance Company.

14. Prior to Chicago Title agreeing to insure BYAC's interest in Parcel 2, Chicago Title had access to the public record.

**The Claim**

15. Parcel 2 is a highly valuable piece of real estate located on the Detroit River, and it is exceptionally important to BYAC because foundations of the Ambassador Bridge sit on Parcel 2.

16. The Ambassador Bridge is owned and operated by Detroit International Bridge Company, which is an affiliate of BYAC.

17. On October 19, 1927, Henry Crapo, Stanford Crapo, and Emma Crapo conveyed their entire interest in Parcel 2 to Pere Marquette and Wabash Railroad Company ("Wabash").

18. In 2018, by quitclaim deed, Norfolk Southern Railway Company ("Norfolk Southern"), as successor in interest to Wabash, conveyed its undivided one-half interest in Parcel 2 to Crown Enterprises, Inc ("Crown").

19. Thereafter, on December 21, 2018, Crown assigned its interest in Parcel 2 to its affiliate, BYAC.

20. Several years after BYAC obtained the undivided one-half interest in Parcel 2, it started negotiating with CSX Corporation ("CSX") – successor in interest

to Pere Marquette - to purchase CSX's interest in Parcel 2 and property in the surrounding area.

21.     During negotiations with CSX, CSX challenged BYAC's interest in Parcel 2.

22.     Specifically, CSX contended that, pursuant to a deed dated July 24, 1908, a part of Parcel 2 (the "Area of Dispute" or "AOD") was conveyed to Pere Marquette (the "1908 Deed").

23.     Therefore, CSX contended that the 1908 Deed controls and CSX has an undivided interest in the AOD of Parcel 2.

24.     After CSX questioned BYAC's ownership interest in the AOD, BYAC retained a real estate law expert, who opined that BYAC had an undivided one-half interest in Parcel 2 ("the Cameron Opinion").

25.     The Cameron Opinion was shared with CSX, but CSX did not accept the conclusion.

26.     Rather, CSX asserted an adverse title claim against BYAC.

27.     On June 7, 2024, BYAC submitted the claim to Chicago Title, which stated, in part, that CSX "has asserted that it owns the entirety of what is referred to in the Policy as 'Parcel 2.' [Chicago Title has] insured that [BYAC] owns an undivided one-half interest in Parcel 2" ("the Claim").

28.     After submitting the Claim to Chicago Title, BYAC, with Chicago

Title's consent, and CSX attempted to resolve the dispute due to the risk of litigation and potential for immense harm to BYAC, and BYAC's affiliates, because the Ambassador Bridge sits, in part, on Parcel 2.

29.    Chicago Title was kept appraised of BYAC and CSX's communications regarding a potential resolution.

30.    Chicago Title consented to BYAC negotiating with CSX in an attempt to resolve the title dispute, rather than filing a quiet title action.

31.    Ultimately, on June 30, 2025, BYAC and CSX resolved their dispute and BYAC agreed to purchase CSX's disputed interest in the AOD of Parcel 2 for $6,481,590 ("the CSX Agreement").

32.    Almost a year and a half after Chicago Title received notice of the Claim, on December 30, 2025, Chicago Title sent a letter to BYAC contending the Claim may not be covered under the Policy due to the common law "Known Loss" Doctrine and/or two exclusions in the Policy.

33.    Chicago Title also claimed it was prejudiced by BYAC's alleged untimely notice of the Claim.

**Acts and Omissions of Chicago Title**

34.    As stated above, Chicago Title was provided notice of the Claim on June 7, 2024.

35.    Since CSX asserted the Claim, Chicago Title consented to and has

been kept apprised of BYAC's negotiations with CSX, and ultimately the CSX Agreement.

36. BYAC requested Chicago Title's consent and agreement to contribute to the CSX Agreement.

37. Due to the work necessary to complete its due diligence associated with the CSX Agreement, BYAC requested Chicago Title's consent to the CSX Agreement by September 2, 2025.

38. On August 27, 2025, Chicago Title contended it was "not in a position to agree to contribute to" the CSX Agreement and requested categories of documents to review prior to making a decision.

39. Due to the confidential and proprietary nature of the documents requested, BYAC and Chicago Title entered into a non-disclosure agreement, and, on September 30, 2025, BYAC produced over 1,100 pages of documents in response to Chicago Title's request.

40. On October 17, 2025, Chicago Title demanded a representative of BYAC submit to an examination under oath in connection with Chicago Title's investigation of the Claim.

41. Additionally, on October 17, 2025, Chicago Title requested a series of additional documents from BYAC.

42. On November 10, 2025, BYAC agreed to the examination under oath,

and produced over 2,400 pages of more documents.

43. On November 24, 2025, Chicago Title took an examination under oath of a BYAC representative, which lasted approximately 11.5 hours.

44. Thereafter, on December 4, 2025, Chicago Title requested additional information and documents from BYAC.

45. On December 15, 2025, BYAC produced more than 3,700 pages of additional documents to Chicago Title.

46. To date, BYAC has produced over 7,300 pages of documents to Chicago Title.

47. Despite all of this information and documentation, Chicago Title has not accepted its duties and obligations under the Policy, nor reimbursed BYAC for the $6,381,590 it paid to settle the Claim.

48. On December 19, 2025, BYAC advised Chicago Title that the closing on BYAC's settlement with CSX would take place on January 14, 2026, and asked Chicago Title to pay the Claim under the Policy.

49. Instead of consenting to the CSX Agreement and reserving its rights, Chicago Title, on December 30, 2025 - two weeks before closing on the CSX Agreement and a year and a half after Chicago Title first received notice of the Claim – sent a coverage position letter wrongly contending "there are multiple independent bases as to why there is no coverage for the Claim under the terms of the Policy and

Michigan law."

50.     Chicago Title's December 30, 2025, Letter was its final coverage position for the Claim to BYAC.

51.     BYAC and Chicago Title attempted to resolve this dispute through mediation on January 9, 2026, but mediation was unsuccessful, although separate from the mediation, Chicago Title agreed not to assert Condition 9(c) [Prior Written Consent] of the Policy in exchange for a reduction of $100,000 in the amount due from Chicago Title in the event BYAC entered into the CSX Agreement.

52.     BYAC and CSX closed on the CSX Agreement on January 14, 2026, and BYAC advised Chicago Title on January 15, 2026, that the CSX Agreement closed, providing relevant documents, and demanding payment from Chicago Title pursuant to the Policy in the amount of $6,381,590, which represents the purchase price for the Area Of Dispute, less the agreed reduction of $100,000.

53.     To date, Chicago Title has failed to indemnify BYAC for the CSX Agreement and continues to request additional documentation and another EUO.

## COUNT I – DECLARATORY JUDGMENT

54.     BYAC repeats and realleges the allegations in paragraphs 1 through 53 as if fully set forth herein.

55.     The Policy constitutes a valid and enforceable contract between BYAC and Chicago Title.

9

56.     BYAC paid all premiums, provided prompt notice of the Claim, and otherwise performed all obligations required of it under the Policy.

57.     Under the terms and conditions of the Policy, Chicago Title agreed to indemnify BYAC against loss or damage sustained or incurred by BYAC "by reason of … Title being vested other than as stated in Schedule A."

58.     As detailed above, CSX and BYAC dispute the ownership of Parcel 2, therefore, any title dispute and any judgment or settlement regarding the ownership of Parcel 2 falls within the coverage grant of the Policy.

59.     BYAC did not breach any conditions of the Policy.

60.     Chicago Title was not prejudiced by any alleged late notice of the Claim.

61.     The Claim is not excluded by the Policy.

62.     To date, Chicago Title has failed or refused to agree to indemnify BYAC for the Claim.

63.     BYAC seeks a declaration from this Court that the Claim is covered under the Policy.

64.     BYAC seeks a further declaration from this Court that Chicago Title is obligated, pursuant to the terms and conditions of the Policy, to indemnify BYAC for the settlement of the Claim for CSX's disputed interest in the AOD of Parcel 2 in the amount of $6,381,590.

65. A judicial determination of the Policy's scope is therefore appropriate and necessary pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57.

66. An actual and justiciable controversy exists between BYAC and Chicago Title concerning the proper construction of the Policy, and the rights and obligations of the parties thereto, with respect to the Claim and CSX Agreement.

67. BYAC is entitled to a declaration that the Policy covers the Claim and that Chicago Title is required to indemnify BYAC for the Claim in the amount of $6,381,590, and any other relief this Court deems just and proper.

<u>**COUNT II – BREACH OF CONTRACT**</u>

68. BYAC repeats and realleges the allegations in paragraphs 1 through 67 as if fully set forth herein.

69. The Policy is a valid and enforceable contract between BYAC and Chicago Title.

70. BYAC has performed all duties and obligations required of it under the Policy.

71. Despite BYAC's notification to Chicago Title on January 15, 2026, that it and CSX closed on the CSX Agreement on January 14, 2026, and BYAC's demand for payment by Chicago Title in the amount of $6,381,590, Chicago Title has failed and/or refused to reimburse BYAC for the settlement of the Claim.

72. Chicago Title has breached the Policy by its failure and/or refusal to

11

reimburse BYAC for the net amount paid to settle the Claim.

73.     As a direct and proximate result of Chicago Title's breach of the Policy, BYAC has suffered damages, and will continue to suffer damages.

### COUNT III– VIOLATION OF MCL 500.2006

74.     BYAC repeats and realleges the allegations in paragraphs 1 through 73 as if fully set forth herein.

75.     Chicago Title is required to act in good faith with respect to its contractual duties and obligations under the Policy.

76.     Chicago Title intentionally disregarded the interests of BYAC and has wrongfully failed and/or refused to reimburse BYAC for the net amount of the settlement of the Claim since BYAC's demand for reimbursement was made on January 15, 2026.

77.     Chicago Title failed and/or refused to reimburse BYAC in order to protect its own financial interest at the expense of BYAC.

78.     Pursuant to the Uniform Trade Practices Act:

A person must pay on a timely basis to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third party tort claimant the benefits provided under the terms of its policy, or, in the alternative, the person must pay to its insured, an individual or an entity directly entitled to benefits under its insured's contract of insurance, or a third party tort claimant 12% interest, as provided in subsection (4), on claims not paid on a timely basis. Failure to pay claims on a timely basis or to pay interest on claims as provided in subsection (4) is an unfair trade practice unless the claim is reasonably in dispute.

MCL 500.2006(1).

79.     Pursuant to MCL 500.2006(4), if benefits are not paid on a timely basis, an insurer shall be liable for simple interest at a rate of 12% per annum on the unpaid amount from a date sixty (60) days after satisfactory proof of loss was received by the insurer.

80.     BYAC provided satisfactory proof of loss for the Claim on January 15, 2026.

81.     Chicago Title's failure and/or refusal to timely reimburse BYAC for the net amount paid by BYAC to settle the Claim under the Policy is in clear violation of the Uniform Trade Practices Act.

## **PRAYER FOR RELIEF**

WHEREFORE, BYAC prays for relief as follows:

(a)     BYAC requests this Court enter a declaratory judgment in its favor and against Chicago Title declaring that the Claim is covered under the Policy; and

(b)     BYAC requests this Court enter a declaratory judgment in its favor and against Chicago Title declaring that Chicago Title is obligated, pursuant to terms and conditions of the Policy, to indemnify BYAC for the amount paid to settle CSX's Claim for its disputed interest in the Area Of Dispute of Parcel 2 in the amount of $6,481,590, less the agreed reduction of $100,000; and

(c)     BYAC requests this Court enter judgment in its favor and against

Chicago Title for breach of the Policy by Chicago Title through its failure and/or refusal to reimburse BYAC for the net amount paid to settle the Claim of $6,381,590, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law; and

(d)     BYAC requests this Court award BYAC penalty interest, as provided for under MCL 500.2006; and

(e)     BYAC requests such other and further relief against Chicago Title as this Court deems just and proper.

Respectfully submitted,

Dated: June 4, 2026                WILSON GROUP LAW PLC

*Haley Baldwin*

_____
James D. Wilson (P41338)
Haley L. Baldwin (P86467)
2000 Town Center, Suite 1900
PMB 16691653
Southfield, MI 48075
(313) 983 – 1234
(313) 983 – 1237
jwilson@wglplc.com
hbaldwin@wglplc.com

*Attorneys for Plaintiff,*
*Boat Yard Acquisition*
*Company, LLC*

14